**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TZE GLOBAL DIS TICARET A.S.**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-2600-KSM** |
| **PAPERS UNLIMITED, INC.**, | |
| Defendant. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                      **August 9, 2024**

In this chapter of the saga that is *TZE v. Papers Unlimited*, before the Court is Plaintiff TZE Global Dis Ticaret A.S.'s ("TZE") Motion for Attorney's Fees under 28 U.S.C. § 1927, Local Civil Rule 83.6.1(b), and the Court's inherent authority against Defendant Papers Unlimited, Inc. ("PU") and its counsel, Rosen Law LLC ("Rosen"), together, "Respondents."[1] (Doc. No. 160.)  Respondents oppose the motion.  (Doc. No. 162.)  For the reasons set forth below, the Court grants the motion in part and denies the motion in part.

## I.     BACKGROUND

### A.     Pleadings

Plaintiff TZE is a commercial paper manufacturer based in Turkey.  (Doc. No. 1 at ¶ 2.) PU, owned and operated by Leonard Seidman and his son, Dustin Seidman, essentially served as a middleman between TZE and its clients.[2]  (*Id.* at ¶ 9; Doc. No. 89 at 132:4–8, 146:21, 148:7–9;

---

[1] The Court also includes in this Memorandum its decision on the order to show cause why PU Plus's filing of the motion to quash and its withdrawal did not violate Rule 11(c).  *See infra* at Part I.F.1; n.18; (Doc. No. 140.)

[2] Leonard Seidman served as PU's President and Dustin Seidman served as the Vice President and Chief

Doc. No. 114-4 at 6; Doc. No. 144-4 at 15.)  In 2019, PU agreed to coordinate the sale of toilet paper between TZE in Turkey and a client in Mexico, Essity Hygiene Y Salud Mexico S.A.D. ("Essity").  (*Id.* at ¶¶ 8–9.)  Under this arrangement, TZE would ship the paper directly to Essity, Essity would pay PU the invoice amount, and PU would remit the payment, less a commission, to TZE.  (*Id.* at ¶ 16.)  However, Essity refused to pay the full invoice amount for one series of shipments because it claimed the paper received was partially defective.  (*Id.* at ¶ 20.)  Instead of paying $618,796.20, the amount of the invoices, Essity paid PU $508,851.38.  (*Id.* at ¶ 23.)  PU unilaterally accepted the price reduction and collected the reduced amount.  (*Id.* at ¶ 22.)  PU told TZE about the alleged quality issue and TZE objected to PU accepting the reduced amount.  (*Id.*)  PU then refused to remit ***any*** of Essity's payment to TZE.  (*Id.* at ¶ 24.)

On June 3, 2020, TZE filed this lawsuit bringing forth claims for breach of contract, conversion, unjust enrichment, and tortious interference, and the case was assigned to the Honorable Eduardo C. Robreno.  (*See generally id.*)  On July 14, 2020, PU, represented by Gary Rosen of Rosen Law LLC, filed an answer and counterclaim for tortious interference with business relations and breach of contract, alleging that TZE's "malfeasance and failure to produce paper products of good quality," caused PU to lose its business relationship with Essity. (Doc. No. 6; *id.* at ¶ 21.)  The breach of contract counterclaim asserts that PU and TZE were parties to an oral agreement, or in the alternative, were parties to a written agreement.  (*Id.* at ¶¶ 56–57.)

### B.    Discovery

Discovery began in July 2020, but the relationship between the parties quickly

---

Operating Officer.  (Doc. No. 89 at 132:4–8, 146:21, 148:7–9; Doc. No. 114-4 at 6; Doc. No. 144-4 at 15.)  Leonard Seidman was the majority owner and Dustin Seidman owned about 5% of PU.  (*Id.*)

disintegrated.  Of note, TZE moved to compel discovery responses on November 23, 2020 (Doc.

No. 13) and moved for Rule 37(d) sanctions on December 10, 2020 (Doc. No. 17).  In its motion

for sanctions, TZE detailed that it had noticed a 30(b)(6) deposition for PU to take place on

December 7, 2020—the last day of fact discovery.  (Doc. No. 17 at 8.)  Despite giving more than

two weeks' notice of that deposition, on the *afternoon* of December 4, 2020 (a Friday, and the

last business day before fact discovery closed), Rosen unilaterally attempted to cancel the

deposition due to "unavailability."  (*Id*.)  Rosen did not appear at the deposition and did not send

a corporate designee.  (*Id*.)  TZE's counsel states that he asked Rosen if he would produce a

30(b)(6) witness notwithstanding that fact discovery had expired, and Rosen expressly declined

to do so.  (Doc. No. 17-1 at 3.)  TZE stated at this point it had been forced to send no less than 5

letters and emails to PU in a three-month span for failure to respond to discovery requests.  (Doc.

No. 17 at 17.)  The Court granted the motion for Rule 37(d) sanctions because "there was no

substantial justification for Defendant failing to appear at the December 7, 2020 deposition or to

timely seek its rescheduling."  (Doc. No. 21 at 2.)

Additionally, included in discovery were TZE's Requests for Admission—signed by

Rosen and verified under penalty of perjury by Dustin Seidman—one of which asked, "Admit

that PU has not paid any portion of the $508,851.38 it received from Essity to TZE **because** there

was an outstanding and/or unresolved dispute regarding quality of PAPER PRODUCTS."  (Doc.

No. 160-9 at 5 ¶ 10.)  PU's response stated, "Deny, but Admit that $508,851.38 was not paid to

Plaintiff by PU *due to damages suffered by PU* due to, among other things, Plaintiff's tortious

interference with PU's contractrual [sic] relationship with Essity."  (*Id.* (emphasis added).)

Later, during the Court's April 8, 2024 evidentiary hearing on the motion for sanctions, Dustin

Seidman testified that PU was holding the money because it was damages for tortious

interference.  (Apr. 8, 2024 Hr'g Tr. at 54:7–10, 105:16–24.)

TZE also reported a number of other concerns that arose during the discovery period, including Rosen's improper use of speaking objections during depositions; his failure to adequately prepare Dustin Seidman, PU's designated 30(b)(6) witness, on topics for which he was responsible; and PU's failure to provide all relevant discovery.  (Doc. No. 160.)  In particular, during the Court's April 8, 2024 hearing, the Court learned that Rosen did not supervise the manner and collection of document production, nor did he speak with his client about email search terms, resulting in the failure to disclose multiple important documents, including (a) bank statements related to the Essity transaction, (b) PU's insurance policies, and (c) most importantly, a "Credit Acknowledgment" signed by Dustin Seidman acknowledging the approximately $109,000 credit to Essity for the defective paper products.  (Apr. 8, 2024 Hr'g Tr. at 75:18–79:8, 79:16–22, 84:4–18, 203:22–207:18, 260:22–263:3.)

Last, TZE noted that during its deposition of Dustin Seidman, it asked Seidman about the location of the $508,000.  (Doc. No. 194 at 36 (excerpting Dustin Seidman Jan. 6, 2021 deposition).)  However, Rosen strenuously objected to these questions, arguing that they were irrelevant and not within the scope of the litigation because they were related to post-judgment collection.  (*Id.*)  Ironically, as TZE points out, the location of the $508,000 would later be the heart of PU's defense at trial, but Dustin Seidman did not answer these questions at the instruction of his attorney.  (*See id.* at 36–38 (excerpting Rosen's opening statement at trial).)

### C.     Summary Judgment

On March 18, 2021, both TZE and PU filed motions for summary judgment.  (Doc. Nos. 24, 25.)  TZE subsequently moved to strike PU's motion for summary judgment and PU's response in opposition to TZE's motion for summary judgment because PU cited only to a "self-

4

serving declaration . . . which itself contains wholly inappropriate legal conclusions, arguments, assertions, and otherwise inadmissible non-evidence" and to the extent the declaration contained "factual statements, they are almost entirely contradicted by Mr. Seidman's earlier deposition testimony." (Doc. No. 28 at 7.) On November 8, 2021, the Court denied both TZE's and PU's motions for summary judgment and denied TZE's motion to strike as moot. (Doc. Nos. 34, 35.) The Court denied TZE's motion because "at best, the [oral] TZE-PU contract is ambiguous." (Doc. No. 34.) The Court also stated that there were genuine disputes of material fact because the agreements between the parties made it unclear whether PU was a broker or purchaser/reseller of the products. (*Id.*) Finally, the Court noted that Dustin Seidman's declaration "largely consists of improper legal conclusions, argument, summaries of evidence, speculation, and hearsay statements. PU treats the declaration as a legal brief, not as one individual's statement of personally known facts." (*Id.*) The Court denied PU's motion because their brief was "nearly devoid of supportive record evidence, citing only one paragraph of one declaration," reiterating its criticism of the citations to Dustin Seidman's declaration. (Doc. No. 35.)

By this point, PU had largely shut down its business activities, and Dustin Seidman had created "PU Plus, Inc.," ("PU Plus") which was registered on January 29, 2021.[3] (Apr. 8, 2024 Hr'g Tr. at 20:20–22, 135:23–136:1; Doc. No. 114-4 at 18–19.) Dustin Seidman testified during the Court's April 8, 2024 hearing that he started PU Plus because his father's health was declining and that continuing his father's business was "not an option" since his father "didn't

---

[3] It appears that PU and PU Plus share certain similarities, such as management and ownership by Leonard and Dustin Seidman, involvement in the international paper sales and shipment industry, and the same phone number and office address. (*See* Doc. No. 114-4 at 6, 8, 18, 21, 23, 27.) Dustin Seidman also stated during the April 8, 2024 hearing that PU Plus would "probably" pay PU's attorney's fees for the remainder of this case. (Apr. 8, 2024 Hr'g Tr. at 101:24–102:2.)

5

want to deal with any financial burdens or risks." (Apr. 8, 2024 Hr'g Tr. at 127:10–16). His father "wanted to be out of the business" and "thought it would be best if [he] just started from scratch on [his]own."[4] (*Id.*)

### D. Trial

The parties, unable to reach an agreement, proceeded to trial on January 10, 2023. After a four-day trial, the jury returned a verdict in favor of TZE and awarded a judgment in the amount of $935,796.20—$585,796.20 for the breach of contract claim, and $350,000 for tortious interference with TZE's business relationship with Essity. (Doc. Nos. 74, 76, 78, 79, 80, 88–90.) The Court notes several key points from the trial:

(a) PU withdrew its breach of contract claim during trial, instead claiming that PU and TZE never had a contract. (Doc. No. 88 at 31:16–19, 35:21–23; Doc. No. 89 at 204:11–14.)

(b) TZE's counsel asked Dustin Seidman, "PU, issued a credit letter, or credit memo, or credit acknowledgment to [Essity] for the $109,944?" and Dustin answered that he was "positive" this was "not true." (Doc. No. 89 at 167:3–10.) TZE's counsel introduced an impeachment exhibit titled "Credit Acknowledgment," which the Court permitted over Rosen's objection that the document was never disclosed to PU.[5] (*Id.* at 167:18–170:7.) Upon review of the document, Dustin acknowledged

---

[4] Interestingly, by this point, PU was also in active litigation in another suit brought on July 15, 2020 for claims including fraud, breach of contract, and negligent misrepresentation. (*See* TZE Ex. 32, Apr. 8, 2024 Hr'g Tr.)

[5] The Court found Rosen's objection meritless. In its opinion denying post-trial motions, the Court labeled PU's argument that TZE had a duty to disclose this letter during discovery a "***monumental irony***", because this exhibit was a document *created by PU, which **PU failed to produce during discovery**.* (*Id.* at 20–21 (emphasis added).) Rather, TZE had been forced to obtain the document pursuant to a third-party subpoena.

that he had signed this document and he had seen it before.  (*Id.* at 170:9–16.)
Dustin justified the memo by stating that it was merely an "acknowledgment.  It's
not, we don't, we didn't admit to giving them a credit."  (*Id.* at 173:7–11.)  On
cross-examination by Rosen, Dustin Seidman explained that this was not a credit
memo because a credit memo would have appeared as a revised invoice with
itemized deductions.  (*Id.* at 175:25–176:11.)

(c)      In his opening statement, Rosen emphasized that "[O]ur client is holding 475,000
dollars of not their money.  It has not been converted to their money.  It is Essity's
money.  What happened in this case [is] that [my] client gets their brokerage fee
of 33,000 dollars, gives the money back to Essity, and let them fight it out if they
have to fight it out."  (Doc. No. 88 at 33:4–10.)  He continued, "the money that
they're holding basically in trust is Essity's money. . . . The emails you see will

---

The full text of the "Credit Acknowledgment" is as follows:

This memo is to document and acknowledge that there is a credit pending of $109,944.82
which has been backed and supported up by numerous quality control reports that have
[b]een sent to the supplier on numerous occasions [sic]. Although Papers Unlimited is not
authorized officially to issue this credit, its [sic] important to note, that we firmly support
Essity in this specific instance and 100% agree that Essity has a right to receive this credit
due to all of the proof sent multiple times relating to the under spec and inferior quality
paper. After many attempts to resolve with [TZE] on behalf of Essity, [TZE] refuses to
acknowledge this credit and Papers Unlimited supports Essity in receiving this credit issue.
***[TZE] has request [sic] a payment of $500,000 from Papers Unlimited in place of the
$609,998.*** Leaving the balance of **$109,944.82** pending, which represents the credit/ claim
amount.

Papers Unlimited is acting solely to assist Essity in receiving the full credit but does not
have any financial responsibility pertaining this outstanding balance or credit. It is our duty
and obligation to stand behind any products we sell with complete support to our customer
Essity in this case, and simply request supplier to act accordingly.

***Please process balance payment to Papers Unlimited, minus the credit amount that has
been discussed and we will support Essity in any way possible*** to rectify this situation with
[TZE].  (Doc. No. 106-6) (emphases added)).

show that we could not release the money that we're holding in trust." (*Id.* at 36:5–21.)  TZE's counsel called a sidebar after this and objected to Rosen's discussion of an escrow account during his opening because Rosen had specifically objected to TZE's questioning along these lines during prior depositions as not relevant to the lawsuit, but now these questions regarding the escrow account were clearly relevant.  (*Id.* at 38:6–39:15.)  Rosen responded that "It's not in escrow.  It's a big difference.  And it's not in a trust account.  But when someone holds someone else's money, they're, in effect, a trustee.  That's what I meant." (*Id.*)  On cross-examination of TZE's witness, Rosen tried to draw out testimony that Essity had paid the $508,000 to PU to hold with the condition that it can be released once the claim is resolved, but TZE's witness refuted this characterization, asserting instead that PU was holding the $508,000 in an attempt to coerce TZE to accept the $109,000 credit offered by PU to Essity.  (Doc. No. 89 at 83:3–87:20.)  Later, on cross-examination of Dustin Seidman, Rosen asked questions such as, "What are the, among other things, are the reasons why Papers Unlimited was ***holding*** the $509,000?" and "what should happen with the $509,000 that Papers Unlimited ***is holding***?", eliciting responses requiring Dustin to acknowledge that PU was holding the funds.  (*Id.* at 180:20–21, 184:11–12 (emphases added).)  Finally, TZE's counsel asked Dustin Seidman on re-direct examination, "Are you in fact holding the money in an escrow account?", to which Seidman responded, "As far as I know, it's in the Citizens Bank account.  I don't handle the financials of the company.  My father Len Seidman does. . . . All I know is that the money is in Citizens Bank." (*Id.* at 187:23–188:14.)  However,

as TZE would soon learn, the $508,000 was *not* held in any account, let alone in "trust," and had in fact been used to pay off PU's line of credit.[6]  (*See infra* n.12; Part III.B.)

### E.    Post-Trial Motions

On January 24, 2023, PU appealed the judgment to the Third Circuit.  (Doc. No. 84.) The Third Circuit stayed the appeal pending the outcome of PU's post-trial motions (Doc. No. 98), and PU eventually stipulated to dismiss the appeal with prejudice in February 2024 (Doc. No. 167).

On February 9, 2023, PU filed a motion for an extension of time to file post-trial motions.[7]  (Doc. No. 94.)  TZE opposed the motion on February 10, noting that Rule 6(b) of the Federal Rules of Civil Procedure gives the District Court discretion to extend the time for filings upon a showing of good cause, but explicitly states that a court "must not extend the time to act under Rules 50(b) and (d), 59(b), (d), and (e), and 60(b)."  (Doc. No. 95.)  The same day, the Court ordered PU to provide a supplemental brief explaining whether the Court had the authority to extend the deadline.  (Doc. No. 96.)  However, rather than respond with supplemental briefing, on February 14, 2023, PU filed its motion for post-trial relief, including five grounds for relief under Rule 50(b), a motion for a new trial under Rule 59(a)[8] and a motion to amend the

---

[6] The evidence shows that PU's line of credit was paid off and terminated by September 2021—well before trial in this case.  (Apr. 8, 2024 Hr'g Tr. at 142:5–10, Doc. No. 194 at 135 (September 2021 PU Line of Credit Statement displaying $0.00 balance).)

[7] PU's deadline to file post-trial motions was February 13, 2023, 28 days following entry of judgment. Fed. R. Civ. P. 59(b); (Doc. No. 96.)  During the Court's April 8, 2024 hearing, Rosen explained that he spoke with TZE's counsel regarding this request for extension, who purportedly agreed to consent to an extension if PU posted a bond.  However, when the parties could not reach an agreement, PU filed the contested motion for extension.  (Apr. 8, 2024 Hr'g Tr. at 209:18–210:6, 238:2–12; Doc. No. 94.)

[8] Specifically, PU's motion for a new trial under Rule 59(a) argued that TZE produced a Credit Authorization during trial that they had an obligation to produce during discovery.  (Doc. No. 97-2 at 21–26.)  PU argued that TZE's "sound strategical move and its decision to conceal the alleged Credit Memo

judgment under Rule 59(e).  (Doc. No. 97.)  PU explained in a letter to the Court that "We thought that we would need additional time but we worked over the weekend to ensure that we were able to file it timely . . . . and our prior motion request for additional time is hereby withdrawn."  (Doc. No. 100.)  The Court denied all of PU's motions for post-trial relief on May 4, 2023.  (Doc. No. 115.)  In particular, the Court held that all of PU's Rule 50(b) motions were waived because PU failed to raise them at the close of evidence in its Rule 50(a) motion, and that the arguments were also meritless.[9]  (*Id.* at 8.)

Also on May 4, 2023, the Court granted TZE's motion to amend the judgment to include interest.  (Doc. No. 115.)  Regarding the equitable consideration factor in considering TZE's motion for prejudgment interest, the Court stated that "[s]ome of PU's behavior during its relationship with TZE and in connection with the litigation has been questionable at best."  (*Id.* at 33.)  The Court pointed to PU's failure to turn over the credit acknowledgement and the fact that PU's stated reason for improperly holding the $508,000 paid by Essity to PU changed throughout the litigation.  (*Id.*)  "In fact, evidence at trial indicated that PU's final purported reason, that PU was holding the money in escrow, was false."  (*Id.*)  PU appealed the Court's Orders granting TZE's motion to add interest to the judgment and rejecting PU's post-trial motions (Doc. Nos. 143, 144), but later stipulated to dismiss the appeal with prejudice in February 2024 (Doc. No. 167).  TZE's judgment award was thus increased $186,749.07 to a total of $1,122,545.27.  (Doc. No. 115.)

---

counsel gave Defendant no realistic opportunity to prepare for the testimony."  (*Id.* at 23.)  Again, as noted *supra* n.5, this argument fails to recognize that the party under an obligation to produce this credit acknowledgment was in fact, PU, not TZE.

[9] *See supra* n.5.

F.       **Execution Discovery**

Eventually, TZE attempted to execute upon its million-dollar judgment, but was continuously thwarted in its efforts.

### 1.       *PU Plus's Motion to Quash Non-Party Subpoenas*

On April 6, 2023, non-party PU Plus (founded by Dustin Seidman in 2021, *see supra* Part I.C.; n.3,) filed a motion to quash TZE's subpoenas to Citizens Bank—where PU Plus had a commercial bank account—and to PU Plus's landlord, 1518 Associates, L.P., claiming that it was improper to serve a subpoena seeking confidential information of non-party PU Plus.  (Doc. No. 109.)  TZE responded to the motion, notifying the Court that it appears PU has engaged in efforts to fraudulently conceal and/or transfer assets to PU Plus to become judgment proof. (Doc. Nos. 111, 112.)  TZE stated that the previous garnishment of PU's Citizens Bank account[10] revealed that PU had only $133.61, rather than the at least $508,000 they claimed to have been holding "in trust."  (Doc. No. 112.)  On May 30, 2023, the Court held a hearing on the motion to quash, which it denied as moot because PU Plus's counsel—also Gary Rosen of Rosen Law LLC—withdrew the motion.  (Doc. Nos. 139, 140, 148.)  In its Order, the Court *sua sponte* ordered Rosen to show cause why the filing of the motion to quash and its withdrawal did not violate Rule 11(c).  (Doc. No. 140.)  This issue has still not been addressed, and the Court incorporates this portion of the record in its overall analysis granting attorney's fees.

### 2.       *TZE's Emergency Petition for Relief in Aid of Execution and Motion to Compel Responses to Discovery in Aid of Execution and for Sanctions*

On May 4 and 5, 2023, TZE filed motions seeking emergency relief in aid of execution,

---

[10] PU represented on multiple occasions that it had only one bank account, an account at Citizens Bank ending in x2085.  (Doc. No. 89 at 189:12–18; Apr. 8, 2024 Hr'g Tr. at 55:14–24; *see also* Apr. 8, 2024 Hr'g Tr. at 28:2–4 (PU accountant testifying that he is only aware of PU having a single bank account).)

to compel discovery responses, and for sanctions.  (Doc. Nos. 114, 122.)  The Court held a

hearing on the motions on May 8, 2023, with Rosen, as PU's counsel, appearing remotely.  (Doc.

No. 126.)  At the hearing, Rosen stated, "I gave [TZE's counsel] everything that I think he asked

for.  Whatever he didn't ask for I'll give him. . . .  [W]e're going to produce the documents, but I

needed some time because we had a lot going on in April."  (Doc. No. 129 at 8:20–24.)  When

the Court asked where the $508,000 was, Rosen responded, "I don't know what it was in.  I don't

think it was in an escrow account.  I'm not sure if they applied [it] to their loans, if Citizens took

the money. . . .  It was not in the account because – it was not in the account.  And what Dustin

Seidman had said was he didn't handle the finances, that the father did . . . .  So Dustin didn't

know, but I will get answers from Citizens Bank. . . .  I don't have [Dustin's] exact testimony

[from trial].  I don't know, but I think what he said was . . . . my father handles that; I don't

handle that."  (*Id.* at 9:15–11:9.)

      The Court found "there are legitimate concerns regarding the fact that Defendant's vice

president, Dustin Seidman, testified that $508,000 was being held in trust in a Citizens Bank

account when that was not true, and that defense counsel could not account for the whereabouts

of the $508,000.  There are legitimate concerns regarding whether Defendant is attempting to

make itself judgment proof by transferring assets to a related entity, Papers Unlimited Plus."

(Doc. No. 127.)  The Court restrained PU from removing any funds from the Citizen Bank

account (the "TRO") and granted the motion to compel PU's responses to TZE's discovery

requests, ordering discovery and depositions to be completed by May 22, 2023.  But the Court

said it would take TZE's requests for Rule 37 fees "under advisement, to be considered again on

May 30, 2023."  (*Id.*)

      On May 16, 2023, PU filed a letter requesting the Court to extend the deadline for the

depositions of Leonard and Dustin Seidman.  (Doc. No. 132.)  Rosen stated that TZE demanded

that he produce Leonard Seidman for a deposition the next day, May 17, 2023, but that he was in

the middle of a jury trial and unavailable for a deposition.  "[TZE's counsel] understands that I

am in a trial, I made it clear, I did not know whether the trial would be proceeding so I could not

confirm with certainty whether the deposition could proceed tomorrow, **but this morning, I**

**notified [TZE's counsel]** that we are proceeding in a trial, and I could not be present for a

deposition tomorrow."  (*Id.* (emphasis added).)  TZE responded to Rosen's letter the next day,

emphasizing that PU refused to respond to TZE's notices of deposition until the day before the

scheduled deposition, and that "[t]his is the ***THIRD TIME*** in this case that PU has employed this

tactic of waiting until the last minute to refuse to participate in a deposition."  (Doc. No. 133

(emphasis in original).)  The Court denied PU's request for an extension of the May 22, 2023

deadline to depose Leonard and Dustin Seidman, and imposed sanctions pursuant to Rule 37(d),

28 U.S.C. § 1927, and the Court's inherent powers because PU's counsel "disregarded this

Court's order and failed to timely object to the scheduling of the noticed depositions."  (Doc. No.

134.)  The same day, PU again filed a request seeking permission to continue the depositions,

TZE objected, and the Court reiterated its ruling that the parties must take the Seidman

depositions by May 22, 2023.  (Doc. Nos. 135–37.)

On May 30, 2023, the Court held another hearing regarding TZE's motions seeking the

Court's assistance with judgment execution.  (Doc. No. 141.)  Although PU argued that it had

provided 711 pages of documents in response to TZE's discovery requests, TZE reported that PU

had not substantially complied with the Court's Order granting the motion to compel discovery,

and Judge Robreno stated during the hearing, "[i]t seems pretty clearly [sic] aside from

justifications and excuses, et cetera, that you haven't produced the information.  You've been

busy.  You're a small firm. . . . but the bottom line is, after five months, the information is not

available.  I think it could conceivably be part of a scheme to deprive the defendant of the

information that they're entitled to.  I don't think we're there, but we're pretty close to being

there."  (Doc. No. 148 at 17:15–20, 44:8–45:13.)  Furthermore, TZE reported that Leonard

Seidman, during his deposition, initially testified that "there's no trust," but then later reversed

course after a break in the deposition and volunteered that the money was "in trust" because he

could always acquire $508,000 through a loan from Citizens Bank.  (Doc. No. 148 at 7:25–8:9;

Doc. No. 138-8 at 36.)  However, Seidman admitted in his deposition that when he closed the

loan account, that was the end of PU and there was no money left.[11]  (Doc. No. 138-8 at 43.)  At

the hearing, Rosen incoherently attempted to explain why he and his clients had asserted that the

money was being held in trust before eventually stating that Leonard Seidman "viewed it as a

trust account because he could take the money back.  And that's why the word was used."  (Doc.

No. 148 at 28:1–29:22.)[12]

Finally, at the hearing TZE reported some "serious concerns" about PU's conduct

because Rosen previously stated that his clients transferred approximately $81,000 to the

Citizens Bank account for the purpose of satisfying the judgment, but during their depositions

Dustin and Leonard Seidman stated that they were not trying to satisfy the judgment and the

---

[11] Leonard Seidman stated for the first time during his post-judgment deposition that the $508,000 was "gone" because it "went to pay bills.  We had bad business.  It was COVID."  (Doc. No. 138-8 at 28.)  He testified that PU stopped doing business in March 2021.  (Id. at 5, 31.)

[12] The Court later learned during the April 8, 2024 evidentiary hearing that PU had a business line of credit with Citizens Bank which was linked to its checking account ending in x2085; this line of credit was a "sweep account," which regularly "swept" the full balance in the checking account to pay off the line of credit.  (Apr. 8, 2024 Hr'g Tr. at 56:8–23.)  In other words, "You borrow money, you use it, and then at the end of [each business] day the bank just sweeps it back in to pay off whatever it can from the [line of credit]."  (Id. at 57:5–13.)  So, on the same day that Essity sent PU the $508,000, it was swept by Citizens Bank to pay for PU's line of credit.  Thus, at best, the $508,000 was only available to PU if they took money from their line of credit to pay TZE.

$81,000 was put in the account by mistake by a customer who had really intended to pay PU

*Plus*.  (*Id.* at 11:11–23; *cf.* Doc. No. 138-8 (L. Seidman Deposition) at 7 ("Q: Does Papers

Unlimited intend to pay the judgment in full?  A: No.").)  Judge Robreno stated at the hearing,

"[i]t seems to me, Mr. Rosen, that this dispute is moving from a discovery dispute to an issue of

false testimony and fraud on the court.  We're not there yet but [it] certainly is not a difficult

discovery dispute.  Folks here are testifying all over the place making all kinds of claims.  Not

only have they conflicted, they are outright false. . . .  I think to the extent that you are

representing the clients, you have some responsibility here above and beyond, 'This is what my

clients told me.'"  (Doc. No. 148 at 44:8–45:13.)  Following the hearing, the Court ordered PU to

fully and completely re-answer TZE's Rule 69 discovery requests, resume the deposition of

Leonard Seidman, and depose PU's accountant if necessary.  (Doc. No. 141.)  The Court also

continued the TRO and stated it would "revisit the need for the TRO after Defendant has

responded to the discovery requests."  (*Id*.)  The Court's Order did not discuss attorney's fees.

(*Id*.)

### G.    Procedural History: September 2023 to Present

On September 28, 2023, following a request by TZE, the Clerk of Court entered

judgment in favor of Plaintiff and against Garnishee Citizens Bank in the amount of

$153,108.40.  (Doc. No. 154.)  On the same day, this matter was transferred to the undersigned.

(Doc. No. 155.)  On September 29, 2023, the parties stipulated to convert the TRO to a

permanent injunction, enjoining PU from removing any funds from its Citizens Bank account

ending in x2085.  (Doc. No. 156.)

On November 1, 2023, TZE filed a Motion for Contempt, alleging that it discovered PU

had improperly transferred $25,778.46 out of the PU Citizens Bank account in violation of the

injunction.  (Doc. No. 158.)  TZE stated that Dustin Seidman claimed that it was PU Plus, rather than PU, who sold the paper goods to a third party, who in turn mistakenly directed the payment of $25,778.46 into the PU Citizens Bank account which was subject to an injunction.  (Doc. No. 158-3 at 7.)  Leonard and Dustin Seidman then coordinated efforts to transfer this money out of the account.  (*Id.*)  The Court held an in-person status conference on the motion on February 20, 2024, after denying PU's counsel's request to appear virtually.  (Doc. Nos. 170, 171, 173.)  Per the parties' agreement, the Court found PU in contempt of the Court's injunction for improperly facilitating the transfer of $25,778.46 from the Citizens Bank account which was the subject of the injunction and granted TZE attorney's fees.  (Doc. No. 174.)

On November 3, 2023, TZE filed the instant Motion for Attorney's Fees, arguing that the totality of Respondents' actions throughout the litigation "reeks" of bad faith, warranting attorney's fees.  (Doc. Nos. 160, 165.)  The Court discussed this motion during its February 20, 2024 status conference, where the parties agreed that Rosen would testify and be cross-examined regarding the motion.  (Doc. No. 187 at 28:22–29:18.)  The Court ordered Rosen and PU to obtain separate counsel to represent them at a future evidentiary hearing on the motion.[13]  (Doc. No. 175 n.2.)  On April 8, 2024, the Court held an evidentiary hearing as to whether Respondents

---

[13] The Court's order scheduling the evidentiary hearing stated in relevant part:

> [T]he Court has determined that an evidentiary hearing is needed to determine whether the alleged bad faith conduct of Defendant Papers Unlimited, Inc., including its President Leonard Seidman, its Vice President Dustin Seidman, and its counsel, Rosen Law LLC (collectively, "Respondents"), during the course of this litigation, which is delineated on pages 7–20 of Plaintiff's Motion for Attorney's Fees (Doc. No. 160), rises to the level of bad faith sufficient for this Court to sanction Respondents by shifting the attorneys' fees and costs incurred by Plaintiff in this matter pursuant to 28 U.S.C. § 1927, Local Rule 83.6.1(b), Federal Rule of Civil Procedure 11, and the Court's inherent authority.

(Doc. No. 175.)  The Court's order also notified the parties that it would hear testimony on the outstanding Rule 11 Order to Show Cause regarding PU Plus's withdrawal of its motion to quash.  (*Id.*; *see supra* Part I.F.1.)

acted in bad faith.  (Doc. No. 189.)  At the hearing, four witnesses testified:  (1) Mitchell

Glashofer, PU's accountant, (2) Dustin Seidman, (3) Leonard Seidman,[14] and (4) Gary Rosen.

(*See generally* Apr. 8, 2024 Hr'g Tr.)  Upon conclusion of the hearing, the parties agreed to file

supplemental briefing regarding the "participation theory" of liability, which TZE argues would

permit the Court to hold Leonard and Dustin Seidman individually liable for sanctions.  (*See*

Doc. Nos. 191, 193.)

  And, on May 17, 2024, TZE filed an additional letter, to which Rosen and PU responded,

arguing that recent documents produced by PU Plus confirmed the existence of additional false

testimony.  (Doc. Nos. 195–97.)  TZE's letter included documentation which it argues

demonstrates that PU Plus paid off PU's line of credit and supports the conclusion that Dustin

Seidman's repeated statements that he had no understanding of how or where PU was holding

the $508,000 was false.  (Doc. No. 195.)

## II.   LEGAL STANDARD

  Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any

case unreasonably and vexatiously may be required by the court to satisfy personally the excess

costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  "[Section]

1927 requires a court to find an attorney has (1) multiplied proceedings; (2) in an unreasonable

and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad

faith or by intentional misconduct."  *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent

Actions*, 278 F.3d 175, 188 (3d Cir. 2002); *see also Ferguson v. Valero Energy Corp.*, 454 F.

App'x 109, 112 (3d Cir. 2011).

  Before a court imposes § 1927 sanctions, it must make a finding of bad faith.  *See In re*

---

[14] Counsel provided medical documentation related to Leonard Seidman's health issues and the Court
allowed him to appear virtually.  (Doc. No. 198 at 133:1–14.)

*Prosser*, 777 F.3d 154, 162 (3d Cir. 2015) ("A court imposing § 1927 sanctions must find bad

faith, but that finding need not be made explicitly."); *LaSalle Nat'l Bank v. First Conn. Holding*

*Grp., LLC*, 287 F.3d 279, 289 (3d Cir. 2002) ("[T]he bad faith requirement is necessary for a

finding of liability, otherwise an attorney who might be guilty of no more than a mistake in

professional judgment in pursuing a client's goals might be made liable for excess attorneys'

fees." (cleaned up)); *Zuk v. E. Pa. Psychiatric Inst. of Med. Coll. of Pa.*, 103 F.3d 294, 297 (3d.

Cir. 1996) ("[B]efore a court can order the imposition of attorneys' fees under § 1927, it must

find wilful [sic] bad faith on the part of the offending attorney."). "Indications of . . . bad faith

are findings that the claims advanced were meritless, that counsel knew or should have known

this, and that the motive for filing the suit was an improper purpose such as harassment." *In re*

*Prosser*, 777 F.3d at 162 (cleaned up); *In re Prudential*, 278 F.3d at 188; *see also In re Avandia*

*Mktg., Sales Pracs. & Liab. Litig.*, 469 F. Supp. 3d 357, 360–61 (E.D. Pa. 2020) ("Bad faith may

also be inferred where a party pursues claims that are clearly frivolous." (cleaned up)).

"[T]he principal purpose of imposing sanctions under 28 U.S.C. § 1927 is the deterrence

of intentional and unnecessary delay in the proceedings." *Zuk*, 103 F.3d at 297 (cleaned up).

"Although § 1927 provides a court with a mechanism for sanctioning vexatious and willful

conduct, courts should exercise [this sanctioning power] only in instances of a serious and

studied disregard for the orderly process of justice." *LaSalle Nat'l Bank*, 287 F.3d at 288

(cleaned up). "[T]he party seeking the imposition of sanctions must show by clear and

convincing evidence that they are warranted." *Johnson v. Smithkline Beecham Corp.*, Civ. No.

11-5782, 2015 WL 1004308, at *7 (E.D. Pa. Mar. 9, 2015). The Court may consider the totality

of the circumstances in analyzing whether § 1927 sanctions are warranted. *See In re Prudential*,

278 F.3d at 189–90 (affirming District Court's finding of bad faith based on the totality of the

circumstances, rather than "any single maneuver").

Similarly, Local Civil Rule 83.6.1(b) provides, "No attorney shall . . . present to the court vexatious motions or vexatious opposition to motions . . . or shall otherwise so multiple the proceedings in a case as to increase unreasonably and vexatiously the costs thereof." "Local Rule 83.6.1 tracks the language of Section 1927, but is somewhat broader in scope because it takes into consideration the Court's inherent power to sanction." *Canada v. Samuel Grossi & Sons, Inc.*, Civil Action No. 19-1790, 2020 WL 8300132, at *2 (E.D. Pa. Sept. 11, 2020) (cleaned up). As with § 1927, before a court imposes sanctions based on Local Rule 83.6.1, it must find bad faith on the part of the offending attorney. *See, e.g.*, *Jarzyna v. Home Props., L.P.*, 783 F. App'x 223, 227 (3d Cir. 2019) ("28 U.S.C. § 1927 and L.R. 83.6.1 authorize sanctions on a showing of bad faith."); *see also In re Avandia*, 469 F. Supp. 3d at 360 ("A finding of bad faith, proved by clear and convincing evidence, usually is required for sanctions imposed under § 1927, Local Rule 83.6.1, or the court's inherent powers."). The Court must conduct a specific and individualized analysis. *See In re Avandia*, 469 F. Supp. 3d at 360 ("A finding of bad faith must be made with specificity, clearly linking any sanction imposed to particular conduct of an individual party or attorney."); *see also Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 144 (3d Cir. 2009) (vacating sanctions imposed by the district court and finding "it was an abuse of discretion [for the district court] to impose sanctions pursuant to [§ 1927 and Local Rule 83.6.1] without undertaking an individualized analysis").

Last, the Court has inherent authority to impose sanctions on those who abuse the judicial process. *See Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991). In *Nasco*, the Supreme Court emphasized that "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission

to their lawful mandates." *Id*. at 43 (citing *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)).

Among these inherent powers includes "the power to discipline attorneys who appear before [the

court]." *Id.* (citing *Ex parte Burr*, 9 Wheat. 529, 531 (1824)).  These inherent powers extend to

nonparties.  *See Backertop Licensing LLC v. Canary Connect, Inc.*, Civil Action No. 22-572-

CFC, 2023 U.S. Dist. LEXIS 117690, at *4 (D. Del. July 10, 2023) ("No matter who allegedly

commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the

inherent power to conduct proceedings to investigate that allegation, and if proven, to punish that

conduct.") (citing *Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir.

2008)).  Circumstances that may justify sanctions pursuant to a court's inherent power include

cases where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."

*Id.* at 45.  Where the Court's sanctions based on its inherent authority include the imposition of

attorney's fees, the Court must first make a finding of bad faith.  *See Republic of the Philippines

v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 n.11 (3d Cir. 1994).

   "A court may resort to its inherent power to impose sanctions even if much of the

misconduct at issue is also sanctionable under statute or rules of court."  *In re Prudential*, 278

F.3d at 189 (citing *Nasco*, 501 U.S. at 45).  However, "because of their very potency, inherent

powers must be exercised with restraint and discretion."  *Nasco*, 501 U.S. at 44.  "[G]enerally, a

court's inherent power should be reserved for those cases in which the conduct of a party or an

attorney is egregious and no other basis for sanctions exists."  *In re Prudential*, 278 F.3d at 189

(quotation marks omitted).

## III.    ANALYSIS

   In its motion, TZE argues that Respondents acted in bad faith by engaging in a prolonged

series of misconduct, including advancing meritless claims and defenses, taking materially

different factual positions regarding its claims, filing frivolous and unsupported motions, suborning perjury and making material misrepresentations of fact and law, withholding key evidence, failing to make required disclosures, obstructing TZE's efforts to execute upon the judgment, and engaging in prior misconduct leading to sanctions, such as failing to timely object to noticed depositions. (Doc. No. 160.)  Respondents argue that nothing in the record shows that they acted in bad faith or multiplied proceedings in an unreasonable and vexatious manner, and instead blame TZE for multiplying proceedings. (Doc. No. 162.)  The Court makes particular findings of bad faith as to specific instances of misconduct highlighted by TZE before considering TZE's argument that the Court should hold Leonard and Dustin Seidman personally liable.

### A.    Rosen Law LLC's Bad Faith

The Court finds bad faith on the part of Rosen Law LLC, represented by Gary Rosen, Esquire, and grants TZE's Motion for Attorney's Fees in part as described in further detail below.

### 1.    Frivolous Motions and Meritless Claims

To begin, the Court finds that Rosen acted in bad faith by filing document after document in this matter setting forth meritless and frivolous claims.  First, throughout the litigation, Rosen put forth that PU withheld the $508,851.38 in an act of self-help.  In responding to TZE's Requests for Admission—which was signed by Rosen and verified under penalty of perjury by Dustin Seidman—PU denied that "PU has not paid any portion of the $508,851.38 it received from Essity to TZE *because* there was an outstanding and/or unresolved dispute regarding quality of PAPER PRODUCTS," but admitted that "$508,851.38 was not paid to Plaintiff by PU *due to damages suffered by PU* due to, among other things, Plaintiff's tortious interference with

21

PU's contractrual [sic] relationship with Essity."  (Doc. No. 160-9 at 5 ¶ 10 (emphasis added).)

Dustin Seidman also admitted during the April 8, 2024 evidentiary hearing that PU was holding

the money as damages for tortious interference.  (Apr. 8, 2024 Hr'g Tr. at 49:15–51:21, 54:7–10,

105:16–24.)  TZE argues that this constitutes evidence of engaging in "self-help," which is

contrary to procedural due process and public policy.[15]  (*See* Doc. No. 160-1 at 11–13.)  At the

Court's April 8, 2024 evidentiary hearing, Rosen attempted to explain that he included the phrase

"due to, *among other things*" to indicate that PU was not engaging in self-help.  (Apr. 8, 2024

Hr'g Tr. at 162:9–164:12 ("[Leonard and Dustin Seidman] told me there's a dispute with regard

to problematic paper that their client, Essity, didn't want to pay for.  So among that, in addition

to that, there was also an issue of tortious interference.").)  However, Rosen's explanation fails to

negate the only plain reading of the admission, and Dustin Seidman's explicit admission, which

is that at least one reason PU held the money was as "damages suffered by PU" due to TZE's

"tortious interference."  (Doc. No. 160-9 at 5 ¶ 10.)  The Court finds that Rosen's failure to

acknowledge the clear lack of merit in PU's argument for withholding the money, in light of

obvious public policy against self-help,[16] needlessly led to and/or expanded the scope of the

litigation by requiring TZE to litigate the propriety of its right to the $508,000.  This constitutes

bad faith.  *See Doherty v. Allstate Indem. Co.*, No. 15-05165, 2019 U.S. Dist. LEXIS 167646, *9

(E.D. Pa. Sept. 30, 2019) (granting sanctions against respondents for filing meritless claims

---

[15] Respondents' opposition to the sanctions motion argues that "the alleged self-help alleged [sic] here predated the commencement of the lawsuit and should not be considered for a motion under 28 U.S.C. § 1927."  (Doc. No. 162 at 23.)  However, the timing of the underlying action is irrelevant—instead, the Court looks to *Rosen's actions* of answering a complaint, filing a counterclaim, and proceeding with years of litigation despite admitting that his clients engaged in self-help, all of which occurred *after* the filing of the complaint.

[16] *See Hineline v. Stroudsburg Elec. Supply Co.*, 559 A.2d 566, 569 (Pa. Super. 1989) ("[T]here is strong public policy against self-help or taking the law into one's own hands.").

because "Allstate spent over $230,000 trying to end the case, and the Court spent countless hours decoding Doherty and Mirarchi's nonsensical theories and trying not to drown in the flood of filings.  Doherty and Mirarchi acted with willful bad faith.  The case was meritless.  Doherty knew as much all along, and Mirarchi knew or should have known it too") (citation omitted); *Loftus v. SEPTA*, 8 F. Supp. 2d 458, 462–63 (E.D. Pa. 1998) (finding bad faith and granting sanctions because the attorney clearly should have known that his claims were meritless following change in Third Circuit precedent); *see also Prudential*, 278 F.3d at 188 (noting that an indicator of bad faith is that the claims were meritless and "counsel knew or should have known this").

Second, the Court finds that Rosen acted in bad faith in filing a post-trial Rule 50(b) motion raising only issues that PU failed to preserve at trial, and therefore had waived.  As Judge Robreno wrote in his opinion denying the motion

> During the trial, PU raised three grounds for judgment as a matter of law under Rule 50(a): (1) TZE's intentional interference claim should be dismissed because there was no evidence of a contract between TZE and Essity; (2) TZE's unjust enrichment claim could not simultaneously be pursued with a breach of contract claim; and (3) TZE's conversion claim should be dismissed under the gist of the action doctrine because it was duplicative of TZE's contract claim.  The Court reserved judgment on all three of these Rule 50(a) motions.  In its current "renewed" motion for judgment as a matter of law under Rule 50(b), PU seeks judgment on TZE's contract claim on the grounds that: (1) the essential terms of the Essity contract were not adduced at trial; and (2) the contract damages were not supported by the evidence.  PU seeks judgment as a matter of law on TZE's tortious interference claim on the grounds that: (1) it is barred by the gist of the action doctrine; and (2) TZE failed to prove the element of intent.  PU also contends that TZE failed to join Essity as an indispensable party under Fed. R. Civ. P. 19.  In that PU failed to raise any of its current Rule 50(b) arguments at the close of evidence in its Rule 50(a) motion, PU has waived them.

(Doc. No. 115 at 6–7 (citations omitted).)

23

Respondents argue that the Rule 50(b) post-trial motion was not brought in bad faith because it was brought to "raise issues which Defendant believes constitute as plain error given this Court's admission of undisclosed evidence which Plaintiff disclosed for the first time at trial to surprise Defendant's witness, as well as improper application of Pennsylvania Law under the "Gist of the Action Doctrine."  (Doc. No. 162-1 at 16.)  However, Rule 50(b) of the Federal Rules of Civil Procedures is clear—a renewed motion for judgment as a matter of law must be just that—a ***renewed*** motion.  As Judge Robreno cited in his opinion, "[i]n order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion." (Doc. No. 115 at 7 (quoting *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993)).)  Here, PU's Rule 50(b) arguments were clearly not raised at trial and Rosen, who has been PU's primary counsel throughout this litigation and who was responsible for raising the original Rule 50(a) motion, was well-attuned to all the issues.  His filing of multiple waived claims post-trial was in bad faith and caused the litigation to multiply vexatiously as TZE had to respond, and the Court had to spend considerable time and resources addressing the motion.  *See Lin v. Sharer (In re Lin)*, No. 15-8039 (MAS), 2017 U.S. Dist. LEXIS 59129, *3–4 (D.N.J. Apr. 18, 2017) (granting sanctions against respondents for filing "appeals that advance meritless claims that have no relationship to the issues on appeal" and "rais[ing] arguments not raised below," and finding that "Appellant's counsel's repeated failures to follow the procedural requirements for appeals have multiplied proceedings in an unreasonable and vexatious manner, thereby increasing the cost of the proceedings").

Third, the Court finds that PU's Rule 59(a) motion for a new trial based on TZE's "impermissibly introduced evidence in the form of a credit acknowledgment between PU and

Essity that was not produced during discovery" (Doc. No. 115 at 18–19), which Rosen filed, constitutes bad faith.  As discussed above, during trial, TZE introduced an impeachment exhibit titled "Credit Acknowledgment," which was signed by Dustin Seidman and sent to Dustin Seidman via email by another PU employee.  (Doc. No. 160-11; Doc. No. 89 at 167:3–10, 167:18–170:7.)  PU unquestionably had an obligation to turn over this evidence during discovery to TZE, as this document lies at the heart of the issue of whether PU improperly granted a credit to Essity.  (Doc. No. 115 at 20.)  Despite this discovery obligation and testimony under oath directly contrary to this document, PU argues it was TZE's obligation to turn over this document after it obtained it from a third party.  (Doc. No. 162-1 at 18.)  No.  TZE had every right to use this document for impeachment purposes as it did during trial.  Yet, Rosen still filed a Rule 59(a) motion for a new trial on the basis of this "newly discovered evidence" that his client *had in its possession and failed to turn over.*[17]  (Doc. No. 97.)  Indeed, Judge Robreno ruled that PU's Rule 59(a) motion was meritless and labelled it a "monumental irony in PU seeking sanctions regarding a document that was created by PU, which PU had a duty to disclose but failed to do so, and which PU now argues was a 'key piece of evidence' of a 'critical nature.'"  (Doc. No. 115.)  The Court finds that this frivolous filing of a Rule 59(a) motion was in bad faith and unreasonably extended the litigation.

Last, the Court finds that Rosen's submission of PU Plus's Motion to Quash TZE's third party subpoenas seeking post-judgment execution discovery, and then withdrawing the same motion, was in bad faith.  On April 6, 2023, non-party PU Plus (founded by Dustin Seidman in

---

[17] As discussed *infra*, the circumstances surrounding discovery and the failure to produce this key document in conjunction with Dustin Seidman's testimony (which completely contradicted the document) leaves the Court with serious concerns that PU's failure to produce this document was intentional and done with the tacit goal that TZE would never learn of its existence.  The Court does not go so far as to find intentional withholding of documents, but notes its serious misgivings.

2021 and also represented by Rosen) filed a motion to quash TZE's subpoenas to Citizens

Bank—where PU Plus had a commercial bank account—and to PU Plus's landlord, 1518

Associates, L.P., claiming that it was improper to serve a subpoena seeking confidential

information of non-party PU Plus.  (Doc. No. 109.)  TZE's counsel, in an email to Rosen on

April 13, 2023, stated that he had no objection to Rosen withdrawing and re-filing the motion to

quash after TZE served an amended subpoena on PU Plus.  (Doc. No. 147-1.)  Yet, rather than

respond to TZE's email, PU Plus withdrew its motion on May 24, 2023, *after* TZE had already

spent time and resources responding to the motion on April 20, 2023.  (Doc. Nos. 111, 138-10.)

On May 30, 2023, Judge Robreno denied the motion to quash as moot because PU Plus had

withdrawn the motion and *sua sponte* ordered Rosen to show cause why the filing of the motion

to quash and its withdrawal did not violate Rule 11(c).  (Doc. No. 140.)  Although Respondents

argue that the motion was meritorious because TZE's requests were "incredibly broad" and TZE

later tailored a subsequent subpoena, the Court finds that the filing of the motion to quash and

failing to respond to TZE's counsel for over one month, forcing TZE to respond to the motion,

and then subsequently withdrawing the motion, constitutes bad faith.[18]  *See Prudential*, 278 F.3d

---

[18] The Court also finds Rosen's conduct as to the motion to quash is frivolous under Federal Rule of Civil
Procedure 11. Rule 11(b) states that by presenting a motion to the court, an attorney certifies that to the
best of his "knowledge, information, and belief, formed after an inquiry reasonable under the
circumstances . . . it is not being presented for any improper purpose, such as to harass, cause unnecessary
delay or needlessly increase the cost of litigation." Rule 11(c), in turn, permits a court to impose
appropriate sanctions on an attorney that violates Rule 11(b).  As discussed above, in its May 30, 2023
Order, Judge Robreno ordered Rosen to show cause why he did not violate Rule 11(c), and the Order
scheduling the April 8, 2024 evidentiary hearing notified Respondents that they may be subject to
sanctions pursuant to Rule 11(c).  (Doc. Nos. 140, 175.)  "It is well-settled that the test for determining
whether Rule 11 sanctions should be imposed is one of reasonableness under the circumstances, the
determination of which falls within the sound discretion of the District Court."  *Brubaker Kitchens, Inc. v.
Brown*, 280 F. App'x 174, 185 (3d Cir. 2008) (quotation marks omitted).  The goal of Rule 11 is
accountability, *Keister v. PPL Corp.*, 677 F. App'x 63, 68 (3d Cir. 2017), and to deter baseless filings,
*Howe v. Litwack*, 579 F. App'x 110, 115 (3d Cir. 2014).  Here, the Court finds that Rosen's filing of the
motion to quash and then subsequently withdrawing the motion after motion practice had already been
completed caused unnecessary delay and was for the improper purpose of harassment.  Accordingly, the
Court alternatively sanctions Rosen for this conduct under Rule 11 of the Federal Rules of Civil

at 188 (noting that an indicator of bad faith is that the claims were meritless and "counsel knew or should have known this").[19]

*     *     *

Thus, the Court holds that Attorney Rosen acted in bad faith in proceeding with the litigation in light of the admission of self-help, in filing of a frivolous Rule 50(b) and 59(a) motion, and in needlessly waiting for TZE to respond to PU Plus's motion to quash before withdrawing the motion. This conduct unreasonably and vexatiously multiplied the proceedings.

## 2.     Reversing Course

The Court also finds that Rosen acted in bad faith in reversing the theory of the case partway through the litigation, and not permitting questions in discovery on a crucial aspect of the case Rosen presented at trial. As discussed above, PU's initial response to TZE's complaint included a counterclaim for breach of *contract*. (*See* Doc. No. 6.) The breach of contract counterclaim asserted that PU and TZE were parties to an oral agreement, or in the alternative, were parties to a written agreement.[20] (*Id.* at ¶¶ 56–57.) Additionally, Dustin Seidman's

---

Procedure.

[19] The Court also finds that Rosen acted in bad faith in filing the opposition to the motion for contempt even though he readily conceded his client's improper conduct during the Court's February 20, 2024 status hearing. (Doc. No. 163; Doc. No. 187 at 7:16–17 ("[Y]es, my client was completely wrong.").) However, the Court has previously granted TZE attorney's fees as to the motion for contempt for PU's improper removal of approximately $25,000 from the restrained Citizens Bank account. (Doc. No. 174.) Since the Court may not grant punitive damages in this context and TZE has already been compensated for its fees spent related to the motion for contempt, the Court declines to grant additional attorney's fees as to this conduct. *See Prudential*, 278 F.3d at 201 ("[Section 1927] provides for sanctions in the form of compensation for provable loss of time and additional expenses incurred by the offended lawyer as a result of the alleged unreasonable delaying action.").

[20] During the Court's April 8, 2024 hearing on bad faith, Rosen stated that he included both assertions of the written and oral contracts in the alternative. (Apr. 8, 2024 Hr'g Tr. at 183:8–16.) However, this does not negate PU's original argument that there was a contract between TZE and PU and later complete reversal that no contract existed.

affidavit, submitted as part of PU's motion for summary judgment, states, "The fact is that TZE had a contract with Papers Unlimited." (Doc. No. 25-2 at ¶ 35.) Yet, at trial, and without any warning,[21] PU withdrew its breach of contract counterclaim, arguing instead that PU and TZE never had a contract. (Doc. No. 88 at 31:16–19, 35:2–23; Doc. No. 89 at 204:11–14.) After nearly three years of litigation, PU's sudden reversal in its theory of the case, denying the existence of the same contract of which it sought to prove breach, without any explanation, was in bad faith. This theory of the case was "readily available for [Rosen] to disclose years ago. . . and [Rosen's] inconsistent, ever-shifting arguments resemble bad faith 'gamesmanship,' which has prevented [TZE] from meaningfully responding to [PU's] claims for years." *Gryglak v. HSBC Bank USA, N.A.*, No. 22-15630, 2023 U.S. App. LEXIS 10946, at *6–7 (9th Cir. May 4, 2023).

For similar reasons, the Court also finds that Rosen's refusal to permit questions during depositions regarding the whereabouts of the $508,000 constitutes bad faith. In its motion for sanctions, TZE argues that Rosen consistently objected to any line of questioning during depositions of PU witnesses as to the location of the $508,000. (*See* Doc. No. 160-1 at 15–16; Doc. No. 160-8 at 6–7 (Rosen objecting during Dustin Seidman's deposition to questions regarding the location of the $508,000).) Rosen stated during the deposition that he objected because the location of the money was "not the scope of this lawsuit" and that TZE was "not allowed to ask questions about recovery of a judgement." (*Id.*) Yet, at trial, Rosen took the

---

[21] PU's statement in response to TZE's undisputed facts at summary judgment disagreeing that the email sent by TZE to Dustin Seidman was not a contract (Doc. No. 29-8 at ¶ 12) is a woefully insufficient signal that PU's theory of the case had changed so drastically, especially in light of Dustin Seidman's sworn statement at the same stage of the litigation that a contract did exist. (Doc. No. 25-2 at ¶ 35 (Dustin Seidman affidavit declared under penalty of perjury stating "The fact is that TZE had a contract with Papers Unlimited").) This illustrates PU's willingness to take inconsistent positions to suit its tactical purposes at the moment.

exact opposite position, emphasizing a newfangled theory to the jury that his client had been *holding* "basically in trust" the $508,000 for the last several years since the complaint had been filed. (Doc. No. 88 at 33:4–10, 36:5–21, 180:20–21, 184:11–12.) The Court finds that this sudden reversal and Rosen's earlier refusal to permit TZE to learn more about the whereabouts of the $508,000 constitutes bad faith. *See Grider v. Keystone Health Plan Cent., Inc.*, No. CIV.A.2001-CV-05641, 2007 WL 2874408, at *34 (E.D. Pa. Sept. 28, 2007), *reversed on other grounds and vacated*, 580 F.3d 119 (3d Cir. 2009) (finding bad faith and granting sanctions where there were numerous instances of the defendants taking "inconsistent positions on matters in this litigation to suit their tactical purposes at the moment").

*    *    *

In sum, the Court holds that Attorney Rosen acted in bad faith by withdrawing PU's breach of contract claim at trial without warning, and by highlighting PU's custody of the $508,000 during trial despite previously refusing to permit TZE's questions regarding the money during depositions. This conduct unreasonably and vexatiously multiplied the proceedings.

### 3.    Post-Judgment Execution Discovery Misconduct

Finally, the Court finds that Rosen acted in bad faith when he told the Court that money was deposited into PU's bank account for the purpose of satisfying the judgment, when in fact it was put there by mistake and PU never had any intent of satisfying the judgment. During the Court's May 8, 2023 hearing, Rosen told the Court that his client had deposited approximately $81,000 into the Citizens Bank account which was subject to the TRO, and that his client deposited the funds in order to satisfy the judgment. (Doc. No. 129 at 22:3–5 (Rosen stating, "Well, he does intend to satisfy what he can do and that's why there's 81,000 in the account now."); *id.* at 12:11–14 ("[I]f we were looking to play games, or my client was looking to play

29

games, 81,000 wouldn't have gone into that account").)  Yet, Dustin Seidman testified during the

Court's April 8, 2024 hearing that he told Rosen immediately after the $81,000 was deposited in

the PU account that a customer had mistakenly paid PU instead of PU Plus.  (Apr. 8, 2024 Hr'g

Tr. at 93:11–94:12 ("Q: Did you tell Mr. Rosen that [the $81,000 deposit] was a mistake in

payment from a customer?  A: Yes.  It was the same customer actually.  Q: Okay.  And when did

you tell Mr. Rosen that?  A: As soon as it happened. . . .  Q: As soon as it happened, okay. . . .

Did you ever tell Mr. Rosen that $81,517 was put into that account in an effort to pay a portion

of the judgment that TZE won?  A: No.  Q: And has PU made any efforts to satisfy the judgment

or pay the judgment at this point?  A: They don't have any money.").)  Also, during his May

2023 deposition, Leonard Seidman stated that PU had no intention of satisfying the judgment.

(*See* Doc. No. 194 at 83 (excerpting Leonard Seidman May 21, 2023 deposition transcript ("Q:

Does Papers Unlimited intend to pay the judgment in full?  A: No. . . . [T]here's no money in

Papers Unlimited, Incorporated to pay.")).)  The Court finds that Rosen was aware that the

$81,000 was meant for PU Plus and not put into the restrained account for the purpose of

satisfying the judgment, and that his false statement to the Court suggesting that PU was

intending to satisfy the judgment was in bad faith.  *See Jacovetti Law, P.C. v. Shelton*, Case No.

2:20-cv-00163-JDW, 2020 U.S. Dist. LEXIS 88549, at \*\*4 (E.D. Pa. May 20, 2020) ("[L]ying to

the Court are precisely the type of conduct that jeopardize the judicial process and justify the

Court's use of its *sua sponte* sanctions authority.").

### 4.    Remaining Allegations of Bad Faith

Although a close call, as to the abundance of allegations related to initial discovery

misconduct, the Court does not find that these incidents rise to the level of bad faith.  The

evidence shows that Rosen failed to discuss search terms with his client during the discovery

process; failed to turn over important bank statements, insurance disclosures, and the "Credit Acknowledgment" memo; and failed to properly prepare the 30(b)(6) witness on topics that he was responsible for testifying to. (*See* Apr. 8, 2024 Hr'g Tr. at 79:16–22 (Dustin Seidman testifying that he developed his own search terms and did not speak with Rosen regarding discovery search terms); *id.* at 84:16–22 (Dustin Seidman testifying that Rosen never asked him to provide a list of the particular terms he searched); *id.* at 76:5–14 (Dustin Seidman testifying that he did not conduct discovery searches specifically relating to Essity); Feb. 20, 2024 Hr'g Tr. at 25:19–26:2 (Rosen stating that he failed to turn over PU's insurance policies because he believed that the policies may not have covered the instant dispute); *id.* at 75:18–79:5 (Dustin Seidman admitting that his failure to turn over the Credit Acknowledgement memo was an "oversight"); *id.* at 260:22–263:3 (Rosen testifying that he did not turn over bank statements showing Essity payments to TZE, even though the Request for Production sought *all* documents demonstrating these payments); Doc. No. 194 at 120–23 (excerpting Dustin Seidman Jan. 6, 2021 deposition transcript testimony that he, the 30(b)(6) witness, was unprepared to testify on behalf of PU as to designated 30(b)(6) topics); *id.* at 125–25 (excerpting Leonard Seidman May 21, 2023 deposition transcript testimony that he, the 30(b)(6) witness, was unprepared to testify regarding designated topics).) However, the Court may not infer bad faith from sheer incompetence, and declines to do so here. *See Zuk*, 103 F.3d at 298 (reversing finding of § 1927 sanctions because the statements only indicated a finding of negligence, rather than willful bad faith).

Additionally, the Court does not find that Rosen alone acted in bad faith to conceal the location of the $508,000 during the course of the litigation. That said, the Court is troubled by Rosen's total failure to ensure the accuracy of the information he elicited from his client during

trial, that PU was **_holding_** money.  (*See* Apr. 8, 2024 Hr'g Tr. at 179:10–13 (Rosen testifying "I

took my clients at their word that they said the money was in the bank."), *id.* at 165:1–7 (Rosen

testifying "I don't believe I ever asked the client to give me proof [showing the money was held

at Citizens Bank].  I usually take the client at its word").)  In fact, PU had not been "holding" any

money, and the money paid by Essity was "swept away" to pay off PU's line of credit the very

same day it was paid.  (Doc. No. 194 at 2 (excerpting Leonard Seidman May 21, 2023 deposition

transcript).)  What's more, PU had been shut down about two years before the trial even began.

(*Id.* at 90 (excerpting Leonard Seidman May 21, 2023 deposition transcript).)  Although Rosen

testified that he was not aware that the money was no longer being held, or that it was never

held, and that he simply trusted his client at its word, it is simply unacceptable for an attorney to

also elicit testimony on this topic without verifying the factual predicate of the question.  *See*

*Apoian v. Am. Home Prods., Corp.*, 108 F. Supp. 2d 454, 460 (E.D. Pa. 2000) ("It appears

therefore that the misrepresentations by counsel are either an egregious attempt to mislead the

Court or a gross oversight and lack of reasonable inquiry under the circumstances into the

evidentiary support for the factual contentions made by counsel in the memorandum of law.

Whether or not counsel believe their 'factual' representations to be true, when counsel cite to the

record in making definitive and significant factual representations and the record does not

contain the factual basis for its contentions, then counsel must account to the Court for

misrepresenting the factual record.").  The Court does not go so far as to find bad faith on

Rosen's part here, but does find that his refusal to permit questions regarding the location of the

money during discovery depositions and then make this the central argument of his case at trial is

bad faith, as discussed above.

Last, the Court takes note of multiple instances of misconduct already sanctioned by the Court throughout this litigation.  (*See, e.g.*, Doc. No. 21 at 2 (granting Rule 37(d) sanctions because there was "no substantial justification for Defendant failing to appear at the December 7, 2020 deposition or to timely seek its rescheduling"); Doc. No. 134 (granting Rule 37(d) sanctions because Rosen "disregarded this Court's order and failed to timely object to the scheduling of the noticed depositions"); Doc. No. 174 (holding PU in contempt of the Court's TRO for improperly facilitating the transfer of funds from a bank account subject to the TRO).) The Court does not grant further sanctions as to these incidents, *see Prudential*, 278 F.3d at 201 ("[Section 1927] does not empower a court to fine a lawyer for poor lawyering or even misconduct.  The statute provides for sanctions in the form of compensation for provable loss of time and additional expenses incurred by the offended lawyer as a result of the alleged unreasonable delaying action."), but takes note of them for the sake of impressing upon Respondents that any further misconduct will be examined closely and sanctioned accordingly.[22]

### B.   PU's Bad Faith

The Court finds that PU acted in bad faith by failing to disclose to either its attorney, Plaintiff, or the Court that the $508,000 was not being held in any bank account.  Rosen testified at the Court's April 8, 2024 evidentiary hearing that his clients told him that the money was sitting in a bank account and that he took them at their word.[23]  (Doc. No. 198 at 179:10–13.)

---

[22] Respondents' attempt to shift blame to TZE for filing frivolous motions is without merit.  (Doc. No. 162-1 at 7–12.)  Respondents argue now for the first time that TZE previously filed improper motions which were denied by the Court and forced PU to expend unnecessary litigation costs.  (*Id.*)  The Court finds this argument disingenuous.  Hindsight is 20/20.  The Court extended Respondents the benefit of the doubt early on.  Then the Court cautioned that Respondents' conduct was getting exceedingly close to warranting sanctions.  The Court will not allow Respondents to use these denials as a sword against TZE. To the extent Respondents seek sanctions against TZE for bad faith conduct, the motion is denied.  *Cf. Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)) ("An issue is waived unless a party raises it in its opening brief").

[23] Leonard Seidman conveniently testified that he could not remember what he told Rosen or when he told

Yet, as discussed above, the money was never held in a trust account, an escrow account, or even held as part of PU's mingled funds in its Citizens Bank account. (Doc. No. 194 at 42 (excerpting Leonard Seidman May 21, 2023 deposition transcript).) In reality, as Leonard Seidman knew from the outset, the $508,000 was "swept away" into PU's line of credit the very same day that it was deposited into PU's Citizens Bank account. (*Id.*) At best, the money was only available to PU if they took out funds against their line of credit at Citizens Bank. (*Id.* at 44.) But the evidence shows that PU's line of credit was paid off and terminated by September 2021, so PU's access to the $508,000, even by means of the line of credit, had extinguished by this point. (Apr. 8, 2024 Hr'g Tr. at 142:5–10; Doc. No. 194 at 135 (September 2021 PU Line of Credit Statement displaying $0.00 balance).)

PU had an obligation to share this information rather than mislead the Court and Plaintiff for *years*. *See* Fed. R. Civ. P. 26(e) ("A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—*must supplement* or correct its disclosure or response in a timely manner *if the party learns that in some material respect the disclosure or response is incomplete or incorrect*") (emphases added); (Doc. No. 13-2 at 29 (TZE Request for Production seeking "All payment confirmations, wire transfer confirmations, cancelled checks, receipts, and any other documents demonstrating payments made by ESSITY to PU for PAPER PRODUCTS."); Apr. 8, 2024 Hr'g Tr. at 80:22–81:23 (Dustin Seidman agreeing that he was asked in document requests to produce all documents reflecting the payments made by Essity, such as bank account statements).) Considering that PU shut down in 2021, two years before trial, PU had ample time to notify all

---

him regarding the money being held "in trust," but testified that "[i]f Dustin said the money was in the bank, then I told him the money was in the bank. . . . I had to tell him the money was in the bank." (Apr. 8, 2024 Hr'g Tr. at 140:16–21, 147:19–23.)

relevant parties that the money was no longer being held, contrary to their attorney's assertions at

trial, and the Court finds that this explicit omission constitutes bad faith, particularly in light of

the numerous outstanding questions regarding PU and PU Plus's finances,[24] questions regarding

the timing of PU's closure and PU Plus's creation, and PU's statements that it does not intend to

satisfy the judgment (Doc. No. 194 at 83 (excerpting Leonard Seidman May 21, 2023 deposition

transcript)).  *See Google LLC v. Starovikov*, 21cv10260 (DLC), 2022 U.S. Dist. LEXIS 207437,

at *16–34 (S.D.N.Y. Nov. 15, 2022) (granting motion for sanctions because the record showed

that the defendants' various misrepresentations to the court constituted a willful attempt to

defraud the court and resist discovery); *cf. Ha v. Baumgart Cafe of Livingston*, No. 15-5530 (ES)

(MAH), 2018 U.S. Dist. LEXIS 70781, at *12–18 (D.N.J. Apr. 26, 2018) (granting sanctions

against attorney for deliberately misleading the court in filings and failing to correct or clarify

the misrepresentations until well after they were pointed out by the defendants); *Brown v.

Kimsey*, No. 22-3441, 2023 U.S. Dist. LEXIS 22762, at *18–45 (E.D. Pa. Feb. 10, 2023)

(granting sanctions in the form of dismissing the plaintiff's complaint with prejudice because the

plaintiff lied about his marital status for the purpose of a loss of consortium claim, lied about the

extent of his injuries, and submitted a forged document).

---

[24] *See* Apr. 8, 2024 Hr'g Tr. at 25:9–33:3 (PU Accountant testifying that PU's 2021 tax return has a line item for $1,172,492 under "Other Assets" with the description "due from affiliate;" that he understood that affiliate to be referring to PU Plus, but inexplicably that neither he, nor Dustin Seidman, nor Leonard Seidman, nor PU's bookkeeper, nor PU's former accountant could account for this line item); *id.* at 94:22–95:8 (Dustin Seidman testifying his understanding that this line item dealt with Leonard Seidman's pension, but unable to provide any other detail exactly how any pension was transferred or why it appears on PU's bookkeeping as an asset); Doc. No. 195 (PU and PU Plus bank and loan statements demonstrating advances taken against each entity's line of credit and transferred to the other entity).)  The Court doubts the Internal Revenue Service will find PU's explanations for these financial irregularities satisfactory.

C. **Leonard and Dustin Seidman**

As to Leonard and Dustin Seidman's liability on an individual basis, the Court declines to grant sanctions at this time because they were not afforded adequate notice that they may be sanctioned by the Court. "The Due Process Clause of the Fifth Amendment requires a federal court to provide notice and an opportunity to be heard before sanctions are imposed." *Prudential*, 278 F.3d at 191 (quotation omitted). "[P]articularized notice is required to comport with due process." *Id.* (quotation omitted). Particularized notice will "usually require notice of the precise sanctioning tool that the court intends to employ." *Id.* (quotation omitted). Here, although the Court's notice setting an evidentiary hearing on the motion for sanctions did identify Leonard and Dustin Seidman as "Respondents," and did specify that Respondents could be sanctioned by the Court pursuant to 28 U.S.C. § 1927, Local Rule 83.6.1(b), Federal Rule of Civil Procedure 11, and the Court's inherent authority, (*see* Doc. No. 175), Plaintiff's original motion for attorney's fees referenced only sanctions against Rosen Law LLC and *PU* as a party corporate entity. (Doc. No. 160.) Leonard and Dustin Seidman did not have the benefit of full briefing on any motion prior to the evidentiary hearing. (*Id.*) The Court holds that the parties' post-hearing supplemental briefing regarding the "participation theory" of liability to hold Leonard and Dustin Seidman personally liable does not overcome the lack of notice in the initial motion which only sought sanctions against PU as a corporate entity. (*See* Doc. Nos. 191, 193.) However, as above, the Court emphasizes its dismay at the serious allegations against Leonard and Dustin Seidman, who apparently failed to explain to their attorney not only where the

36

$508,000 was being held, but also that PU had shut down even before trial began.[25]  The Court

does not look favorably upon such deceitful behavior.[26]

### D.    Attorney's Fees

Overall, the Court finds that Rosen acted in bad faith by (1) failing to acknowledge the

clear lack of merit in PU's "self-help" argument, (2) filing a frivolous post-trial Rule 50(b)

motion raising issues that PU failed to preserve at trial, (3) filing a frivolous post-trial Rule 59(a)

motion for a new trial based on TZE's "impermissibly" introduced Credit Memo evidence,

which PU had in its possession and failed to produce in discovery, (4) withdrawing PU Plus's

motion to quash only after TZE had responded to the same motion, (5) withdrawing PU's breach

of contract claim during trial after nearly three years of litigation, (6) refusing to permit questions

during a deposition regarding the whereabouts of the $508,000 but then emphasizing,

incorrectly, to the jury during trial that his client was *holding* the money, and (7) misrepresenting

---

[25] The Court has serious concerns that Leonard and Dustin are conveniently pointing to each other to deflect responsibility, with Dustin Seidman suggesting that he has no knowledge of how the finances operate at either entity, and Leonard Seidman suggesting that he cannot remember what he told Dustin Seidman or Gary Rosen.

[26] While we do not do so here given the lack of notice discussed above, the Court may sanction non-parties pursuant to its inherent authority.  *See Backertop*, 2023 U.S. Dist. LEXIS 117690, at *4 (citing *Manez*, 533 F.3d at 585) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation, and if proven, to punish that conduct.").  Specifically, here the Court may sanction Leonard and Dustin Seidman because they have a substantial interest in the outcome of the litigation and have substantially participated in the proceedings in which they interfered.  As described above, Leonard and Dustin Seidman were the President and Vice President of PU respectively, both testified multiple times in depositions and at trial, and both appear to be the primary players in this family business.  (Doc. No. 89 at 132:4–8, 146:21, 148:7–9; Doc. No. 114-4 at 6; Doc. No. 144-4 at 15; Apr. 8, 2024 Hr'g Tr. (both Leonard and Dustin Seidman testifying); Doc. No. 194 at 13, 150 (excerpting Dustin Seidman depositions on Jan. 6, 2021 and May 21, 2023); *id.* at 38, 51 (excerpting Leonard Seidman depositions on May 21, 2023 and June 26, 2023 (30(b)(6))).)  The Court cannot imagine nonparties who could have a stronger interest in the outcome of this matter.  *See Bartos v. Pennsylvania*, No. 08-CV-366, 2010 WL 1816674, at *17–18 (M.D. Pa. May 5, 2010) ("[W]hen considering the imposition of sanctions on a non-party witness or deponent, to be subject to the Court's inherent power to sanction, a non-party not subject to court order must (1) have a substantial interest in the outcome of the litigation; and, (2) substantially participate in the proceedings in which he interfered.") (quotation and alteration omitted).

to the Court that his client deposited approximately $81,000 into the restrained Citizens Bank account for purposes of paying the judgment when he knew it had been put there by mistake. Additionally, the Court finds that PU acted in bad faith in failing to disclose to either its attorney, Plaintiff, or the Court that the $508,000 was not being held in any bank account.

Based on this misconduct, the Court grants the following monetary sanctions:

As to Rosen's filing of frivolous motions and withdrawing the motion to quash (items 2, 3 and 4 above), the Court grants sanctions in the amount TZE spent on attorney's fees for its response to the motion for post-trial relief (Doc. No. 106) and the response to the motion to quash (Doc. No. 111). As to Rosen's refusing to permit questions during depositions regarding the $508,000, but then emphasizing during trial that PU was holding the money (item 6 above), the Court grants sanctions in the amount TZE spent on attorney's fees for Dustin Seidman's January 6, 2021 deposition. As to Rosen's failing to acknowledge PU's meritless "self-help" argument, withdrawing of PU's breach of contract claim *during trial*, and misrepresenting to the Court that his client deposited $81,000 into the restrained account for purposes of satisfying the judgment (items 1, 5 and 7 above), the Court grants attorney's fee sanctions in the amount TZE spent on trial, including trial preparation, and all post-judgment execution efforts, including the amounts spent on the motion for attorney's fees (Doc. No. 160) and the Court's April 8, 2024 hearing, but excluding any misconduct which was previously sanctioned. The Court finds that these sanctions provide compensation "for provable loss of time and additional expenses incurred by the offended lawyer as a result of the alleged unreasonable delaying action." *Prudential*, 278 F.3d at 201.

As to PU's bad faith in neglecting to inform its attorney, Plaintiff, or the Court that the $508,000 was not being held in any bank account, and PU's affirmative statements during trial

that it was holding the money, the Court, based on its inherent authority, also grants attorney's fee sanctions in the amount TZE spent on trial, including trial preparation, and all post-judgment execution efforts, including the amounts spent on the motion for attorney's fees and the Court's April 8, 2024 hearing, but excluding any misconduct which was previously sanctioned.  *See Backertop*, 2023 U.S. Dist. LEXIS 117690, at *4 (citing *Manez*, 533 F.3d at 585  ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation, and if proven, to punish that conduct.")).  Because the Court finds that Rosen and PU are equally liable for the delay and wasted resources that TZE was forced to endure throughout this litigation, the Court holds that Rosen and PU shall share equally (e.g., 50%) the sanction costs of the trial, post-judgment execution efforts, and the motion for attorney's fees, including the Court's April 8, 2024 evidentiary hearing.

IV.    **Conclusion**

For the reasons set forth above, the Court grants in part and denies in part the Motion. TZE's counsel shall submit an accounting to the Court of all fees billed to and collected from TZE, categorized as outlined above, *supra* Part III.D, so the Court can determine the exact amount of fees to be returned.  An appropriate order follows.